431 So.2d 893 (1983)
James Edward NASH, Plaintiff-Appellant,
v.
EWING TIMBER, INC. and Worldsurance, Inc., Defendants-Appellees.
No. 15358-CA.
Court of Appeal of Louisiana, Second Circuit.
May 3, 1983.
*894 Gordon, Bailey & Associates by Norman R. Gordon, Shreveport, for plaintiff-appellant.
*895 Blake & May by John C. Blake, Jonesboro, for defendants-appellees.
Before HALL, JASPER E. JONES and NORRIS, JJ.
HALL, Judge.
The plaintiff in this workers' compensation suit is James Edward Nash who was a pulpwood producer working for Ewing Timber, Inc. The defendants are Ewing Timber, Inc., plaintiff's employer, and Worldsurance, Inc., Ewing's workers' compensation insurer. Plaintiff filed this suit in September 1981, seeking total and permanent disability benefits for injuries and disability allegedly resulting from an accident which occurred when he fell from a pulpwood truck on June 30, 1979. Plaintiff had previously been paid compensation benefits for 93 weeks. After trial the district court found that plaintiff had recovered from the injuries he received in the accident and that plaintiff had failed to bear his burden of proving that his disability existing at the time of trial was caused by the injuries received in the accident. From a judgment rejecting his demands plaintiff appealed. For reasons expressed in this opinion we reverse the judgment of the district court and render judgment in favor of the plaintiff for total and permanent disability benefits and rejecting plaintiff's demands for penalties and attorney fees.
Plaintiff, in his mid-fifties, is an uneducated man who, as found by the trial court, "has evidently worked very hard his entire life prior to this accident." His work had always consisted of moderate to heavy manual labor. He had worked as a pulpwood producer for 15 years, seldom if ever missing a day's work and without complaint.
At the time of the accident plaintiff was standing on top of logs which had been loaded on a flatbed truck when one of the chains binding the logs slipped, pulling plaintiff off of the truck and throwing him to the ground, a distance of about 8 to 10 feet. As he was falling plaintiff hit his elbow on the winch lever and then landed on his back. Plaintiff immediately sought treatment for his injured elbow from a general practitioner, and during the ensuing two and one-half years until trial in December 1981 was seen and treated by numerous doctors for complaints relating to his right arm, neck, low back, and knees.
Plaintiff continued to work for about three months following his injury until the end of September or the first of October, limiting his activities to supervising and driving the truck because of elbow, back, and knee pain. Prior to the accident plaintiff performed all of the heavy work necessary for the production of pulpwood including sawing, loading logs onto the truck, and driving the truck to the woodyard.
The report of the general practitioner, Dr. Middleton, who plaintiff saw on the day of the accident noted only a finding of contusion of the right elbow with nerve irritation and the doctor's opinion that plaintiff should be able to resume regular work in about three days. On July 18, about six weeks after the accident, plaintiff went to see Dr. Simonton, an orthopedic surgeon. On the initial visit Dr. Simonton noted that plaintiff had a small chip fracture in the right elbow and narrowing of cartilage space and spurring in the right knee. Dr. Simonton saw plaintiff again on August 1, August 15, and September 7 during which time he treated plaintiff for the injuries previously noted and made X rays of his cervical spine. Dr. Simonton's deposition discloses that the plaintiff mentioned pain in his right elbow, up the arm to the shoulder and into the shoulder, pain in his left knee, and in his neck. Dr. Simonton was of the opinion that because of osteoarthritis in the cervical spine and degenerative joint disease plaintiff could anticipate a progressive increase in symptoms over a period of time and that he would have difficulty performing work requiring heavy lifting, bending, or similar activities. The doctor was of the opinion that plaintiff's arthritic condition had been aggravated as a result of the accident, that he had recovered from the aggravation, but that he would expect plaintiff to continue to have trouble indefinitely. Although Dr. Simonton was firm in his opinion that any aggravation *896 of plaintiff's arthritic condition caused by the fall should have cleared up, the doctor did answer "yes" when asked if the fall superimposed on the preexisting arthritic difficulty left plaintiff in pretty bad shape and when asked if the aggravation of his preexisting condition precipitated and exacerbated his disability. Dr. Simonton saw plaintiff again on September 25 and October 19, but not thereafter.
The plaintiff was examined by Dr. Smith, a specialist in rehabilitative medicine with the Lincoln General Hospital in Ruston. Dr. Smith testified that plaintiff mentioned that he had been experiencing back pain but that it was much better. Dr. Smith had plaintiff admitted to the hospital, from which he was discharged on November 7. The hospital records reflect low back pain as one of the plaintiff's significant symptoms. Dr. Smith saw plaintiff again on December 10 at which time the doctor discharged him, finding no fracture of the elbow and no disability of the back. Dr. Smith was of the opinion that plaintiff probably could drive a pulpwood truck at that time.
On December 17, 1979 plaintiff was examined by Dr. Green, an orthopedic specialist in Shreveport. Plaintiff complained of low back pain since the accident in June and of left leg pain. Dr. Green found that plaintiff was suffering from degenerative joint and disc disease and his diagnosis was lumbosacral sprain, persisting joint and disc disease of the lumbar spine. Dr. Green was of the opinion that plaintiff had a relatively acute problem resulting from an aggravation of his preexisting joint and disc disease of the lumbar spine. Plaintiff was seen by Dr. Green again on January 7, 1980 and on January 28, February 18, and March 11. Dr. Green noted that plaintiff was extremely agitated. At this time plaintiff was having more problems with his elbow and Dr. Green had him evaluated by a neurologist. Based on the neurological findings Dr. Green referred plaintiff to Dr. Long, a Shreveport neurosurgeon, for examination and treatment of the elbow injury.
The plaintiff was examined by Dr. Long on March 14, 1980. Dr. Long noted plaintiff's low back pain problem which he did not address because that was being attended to by Dr. Green. Dr. Long performed surgery on March 25 to correct the ulna nerve compression problem and plaintiff was discharged from the hospital three days later. Dr. Long was of the opinion that insofar as the elbow problem was concerned, if plaintiff had had no other problems he would have been able to go back to work in three months after surgery. However, Dr. Long continued to see plaintiff on numerous occasions during which time plaintiff complained of back pain, left upper arm pain, multiple joint complaints, particularly neck, right shoulder, right elbow, and left hip. The doctor noted that plaintiff was extremely nervous. Dr. Long examined and treated plaintiff on April 4 and 21, May 26, June 23, and August 22, 1980. Dr. Long was of the opinion that plaintiff's arthritic back condition had been aggravated by the on-the-job injury. He thought plaintiff possibly ought to have a myelogram and referred him back to Dr. Green for evaluation. Dr. Long saw plaintiff one other time, on May 12, 1981, at which time plaintiff had the same complaints, all related to his low back. Dr. Long gave plaintiff a 20 percent disability of the whole body due to the ulna nerve palsy.
Plaintiff went back for examination by Dr. Green on October 21, 1980. At that time Dr. Green found the same degenerative disc and joint disease and felt that because of the injury superimposed on the preexisting arthritic condition plaintiff would not be able to return to his previous employment. Dr. Green saw plaintiff again on December 23 and at that time discharged him to return as needed. Plaintiff was examined by Dr. Green again on April 30, 1981 at which time plaintiff was continuing with his back complaints. Dr. Green ascribed to plaintiff a 10 percent total and permanent disability for lumbar strain superimposed on degenerative disc disease in the lumbar spine. He noted the plaintiff's extreme anxiety. Dr. Green was of the *897 opinion plaintiff could do some work but could not go back to being a heavy laborer in a pulpwood truck.
About this same time plaintiff, in cooperation with his brother-in-law, went back into the pulpwood producing business, this time working for Sam Pullig. The evidence indicates that he worked from about the first part of March until the first part of June 1981. Sometime in May an employee of Ewing Timber Company discovered that plaintiff was working, and based on the report of plaintiff working and medical reports from the doctors, compensation benefits were terminated. The testimony of plaintiff and two of his co-workers during this period of time discloses that plaintiff worked only three or four days a week as he was able, did not do any heavy work such as sawing or loading, and that although he drove the pulpwood truck to the lumberyard he did not drive the truck deep into the woods where the logs were being cut. Plaintiff would rest and stretch out on the ground while waiting for the truck to be loaded.
On May 16, 1981 plaintiff was examined by Dr. Burda, a specialist in rheumatology in Shreveport. Dr. Burda found that plaintiff had osteoarthritis of the cervical and lumbar spine, possible lumbar disc and traumatic right ulna nerve palsy secondary to the injury, and fracture of the elbow, all as a result of the accident. Dr. Burda thought plaintiff should be admitted to the hospital to have a lumbar myelogram done. The doctor referred plaintiff to a dermatologist for treatment of neurodermatitis which is a severe case of itching suffered by people under stress and pain. Dr. Burda also examined plaintiff on October 12 and October 24, 1981.
At about the same time he began seeing Dr. Burda plaintiff was examined and treated by Dr. Williams, a psychiatrist in Shreveport. Plaintiff saw Dr. Williams on May 28, July 23, and September 21, 1981. The psychiatrist found that plaintiff was suffering from depression secondary to his accidental injury.
On December 7, 1981 plaintiff was interviewed by Mr. Kenneth Stephens, Rehabilitation Director of Crawford Rehabilitation Services and an expert in vocational rehabilitation counseling. Mr. Stephens also reviewed all of the medical reports. It was Mr. Stephens' testimony that in view of the plaintiff's functional limitations as described by the doctors, Mr. Stephens could not recommend plaintiff for a job driving a truck. Stephens expressed the opinion that in view of a combination of factors, his age, educational level, his physical limitations, and his work history, plaintiff would fall into the category of workers who are last hired and first fired. In his opinion a reasonably stable market for the kind of work that plaintiff can now do does not exist in the area. Plaintiff's employability is limited in view of his age, education, previous work experience, and is further limited by the functional limitations.
The depositions of the doctors were taken in November 1981 and the case was tried in December. The trial court's decision was rendered in June 1982 and judgment was signed in September.
The plaintiff in a workers' compensation suit, as in other civil cases, has the burden of proving his claims by a preponderance of the evidence. Specifically, the plaintiff is required to prove the extent of his disability, if any, and that the disability was caused by an accident arising out of and in the course of his employment. Martin v. H.B. Zachry Co., 424 So.2d 1002 (La. 1982); Lucas v. Insurance Company of North America, 342 So.2d 591 (La.1977); Dunn v. Glen D. Lowe Co., 346 So.2d 1337 (La.App. 3d Cir.1977).
Medical testimony must be weighed in the light of other credible evidence of a nonmedical character, such as a sequence of symptoms or events, in order to judicially determine probability. A plaintiff-employee's disability will be presumed to have resulted from an employment accident if before the accident the plaintiff-employee was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously *898 manifest themselves, provided that the evidence shows that there is a reasonable possibility of causal connection between the accident and the disabling condition. This presumption is not a conclusive one; rather, it compels a defendant to come forward with sufficient contrary evidence to rebut it. Hammond v. Fidelity & Casualty Company of New York, 419 So.2d 829 (La.1982).
The fact that a condition is preexisting does not preclude recovery for the disabled employee; the employer takes the employee as he finds him, and the fact that the disease alone might have disabled the employee in its ordinary course of progress is not the inquiry. The employee's disability is compensable if a preexisting disease or condition is activated or precipitated into disabling manifestations as a result of a work accident. Hammond v. Fidelity & Casualty Company of New York; supra; Allor v. Belden Corp., 393 So.2d 1233 (La. 1981); Laughlin v. City of Crowley, 411 So.2d 708 (La.App. 3d Cir.1982).
When doctors speak of cause they are essentially speaking of etiologythe origin of disease; what initially causes a disease. When courts and lawyers speak of cause they are concerned with the question of whether the particular incident in question contributed to the plaintiff's disability by making manifest symptoms previously unnoticed. Causation is not necessarily and exclusively a medical conclusion. It is usually the ultimate fact to be found by the court, based on all the credible evidence. Hammond v. Fidelity & Casualty Company of New York, supra; Haughton v. Firemen's Fund American Insurance Companies, 355 So.2d 927 (La.1978).
In the instant case the evidence is that the plaintiff, prior to the accident, was a hard worker, who performed heavy manual labor, seldom missing a day of work, and without complaints. There is no dispute that the defendant was involved in a traumatic accident in which he struck his arm and fell 8 to 10 feet to the ground on his back. He sustained a fracture of the right elbow which required surgery and for which he was medically ascribed a percentage of functional permanent disability. The believable testimony of the plaintiff and a co-worker is that he experienced back pain at the time of or shortly after the accident and that his work activities thereafter were limited, partly because of the back pain. Although the trial court attached significance to the fact that plaintiff did not mention the back pain to the general practitioner who saw him on the day of the accident or to the orthopedic specialist on his first visit to him about six weeks after the accident, this fact seems less significant because the elbow injury at that time was more acute. It is to be noted that Dr. Simonton performed X rays of the cervical spine and noted neck pain complaints on the plaintiff's second examination about seven or eight weeks after the accident. There is no question but that thereafter for more than two years following the accident plaintiff complained of and was examined and treated for back pain. Doctors Simonton, Green, Long, and Burda all agreed that the accident had aggravated plaintiff's preexisting arthritic and degenerative back condition. Dr. Simonton was of the opinion that when he last saw plaintiff, enough time had elapsed so that the aggravation caused by the accident should have subsided and that plaintiff's complaints and disability at that time were due to the preexisting condition. The fact is, however, that plaintiff's symptoms of back pain which had not existed prior to the accident and which manifested themselves following the accident continued to persist. Doctors Green, Long, and Burda, on the basis of their extended examinations, believed plaintiff's persisting pain and disability to be due to the injury superimposed upon the preexisting conditions.
The presumption of causation applies in this case. Before the accident the plaintiff was in good health, but commencing with the accident the symptoms of the disabling back condition appeared and thereafter were continuously manifest. The testimony of the doctors establishes a reasonable possibility of causal connection between the accident and the disabling condition. The defendants have not come forward with *899 evidence sufficient to rebut the presumption that the accident caused the disability.
That plaintiff is disabled from performing the heavy manual labor required of a pulpwood producer is clearly established by the evidence. Since heavy manual labor is the only kind of work plaintiff has ever done, and considering his age, lack of education, and inability to compete in the labor market, plaintiff falls into the odd-lot category and must be considered as totally and permanently disabled. Oster v. Wetzel, 390 So.2d 1318 (La.1980).
Compensation payments were made to plaintiff for 93 weeks in the amount of $133.40 per week, based on 66 2/3 percent of an average weekly wage of $200 per week. Plaintiff asserts on appeal that his average weekly net wages prior to the accident exceeded the average weekly wage in employment covered by the Louisiana Employment Security Law of $210.88 as of the date of the accident, and therefore plaintiff is entitled to the maximum benefit of $141 per week. Plaintiff testified vaguely that after deducting wages paid to his helpers and expenses of his trucks and other equipment, his net was about $500 per week. The president of the employer corporation testified that based on his knowledge and experience in the pulpwood business he would be surprised if plaintiff could have netted over $200 per week. The trial court resolved this factual issue in favor of the defendant. We cannot say that this conclusion by the trial court was manifestly erroneous, particularly in view of the fact that a claim form signed by the plaintiff at the time compensation payments were begun showed his weekly wage as $200 and he accepted compensation payments in the amount of $133.40 per week based on such weekly wage for a period of 93 weeks without complaint.
As to penalties and attorney fees, we find that the decision by the defendants to terminate payment of compensation benefits to the plaintiff was not arbitrary, capricious, or without probable cause. A serious dispute existed between the parties as to whether there was a causal connection between the employment accident and plaintiff's disability. The facts that the back injury was not promptly reported or evidenced by the initial reports of examining doctors, that plaintiff resumed working in the pulpwood business for a period of time, and the reports of Doctors Smith and Simonton, gave defendants reasonable justification for terminating compensation payments at the time they did so.
For the reasons assigned, the judgment of the district court rejecting plaintiff's demands for workers' compensation benefits is reversed and set aside. It is ordered, adjudged, and decreed that there be judgment in favor of plaintiff, James Edward Nash, against defendants, Ewing Timber, Inc. and Tri-State Insurance Company, in solido, awarding the plaintiff total and permanent disability benefits in the amount of $133.40 for the period beginning on the date of the last payment of weekly benefits to the plaintiff and continuing for the duration of plaintiff's disability; all past due payments to bear legal interest from their due date until paid; and medical expenses as provided in LSA-R.S. 23:1203; and for all costs of these proceedings, including the cost of appeal. Plaintiff's demands for penalties and attorney fees is rejected.
Reversed and rendered.